UNITED STATES DISTRICT COURT
DISTRICT OF **NEW JERSEY**

**STUDENTS FOR JUSTICE IN PALESTINE, NEW JERSEY INSTITUTE OF TECHNOLOGY CHAPTER; YAHYA HABEHH; UMAIR KHAN; USMAN AHMAD KHWAJA; IBRAHEEM ALJAYEH; AHMAD JAMHOUR; FARIS QADDOURA,**

Plaintiff(s),

v.

**NEW JERSEY INSTITUTE OF TECHNOLOGY; DAVID JONES; MARYBETH BOGER; MATTHEW GOLDEN; ANDREW CHRIST; LATOSHA WILSON; BRUCE BUKIET; TEIK LIM; KATHRYN HAGEMAN; MICHAEL DAVIS; JANE & JOHN DOES 1-10 and XYZ CORPORATIONS 1-10 (fictitious defendants),**

Defendant(s).

Case No. **2:26-cv-01771**

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**Lindsay A. McKillop**
The Law Office of Rajeh A. Saadeh, L.L.C.
1200 Route 22 East, Suite 2000
Bridgewater, New Jersey 08807-2943
(908) 864-7884
**lmckillop**@rajehsaadeh.com

# TABLE OF CONTENTS


Page

**TABLE OF AUTHORITIES** ........ i

**INTRODUCTION** ........ 1

**PERTINENT FACTS & STATUTES** ........ 3

**LEGAL STANDARD** ........ 9

**ARGUMENT**

**I. THE FEDERAL PLEADING STANDARD SHOULD NOT BE MECHANICALLY APPLIED TO COUNTS THAT WERE DRAFTED AND FILED IN STATE COURT UNDER NEW JERSEY'S MORE LIBERAL PLEADING STANDARD, AND DISMISSAL OF ANY COUNT SHOULD BE WITHOUT PREJUDICE WITH LEAVE TO AMEND** ........ 11

**II. PLAINTIFFS ADEQUATELY PLEADED CLAIMS FOR DISCRIMINATION** ........ 14

**a. Count Six adequately pleaded a claim under Title VI against NJIT** ........ 14

i. Individual Defendants are not liable under Title VI ........ 15

ii. Plaintiffs plausibly alleged intentional discrimination by NJIT ........ 15

iii. NJIT's name restriction was not content neutral ........ 17

**b. Plaintiffs adequately pleaded claims under the LAD and CRA** ........ 20

i. Count One adequately states a claim ........ 20

ii. Count Two adequately states a claim against Defendant Jones ........ 23

iii. Count Three adequately states a claim against Defendant Wilson ........ 23

iv. Count Four states a timely and actionable claim against Defendant Bukiet ........ 24

v. The LAD's aiding and abetting framework is inapplicable to this matter ........ 27

**III. PLAINTIFFS ADEQUATELY PLEADED A CLAIM UNDER THE FIRST AMENDMENT** ........ 29

**a. NJIT is a proper defendant under 42 U.S.C. § 1983** ........ 29

i. The Fitchik balancing test cannot be resolved against Plaintiffs at the pleading stage ........ 29

ii. Even if NJIT is an arm of the State, Will does not bar Plaintiffs' claims for prospective injunctive relief ........ 30

**b. Individual Defendants are not entitled to qualified immunity ........ 31**

i. The right to recognition for student organizations without viewpoint discrimination is clearly established ........ 32

ii. The "misleading name" argument does not justify the restriction ........ 33

iii. Individual Defendants' personal conduct violated Plaintiffs' clearly established constitutional rights ........ 35

**CONCLUSION ........ 35**

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ........ passim

Ashton v. Okemos Pub. Schs., 716 F. Supp. 3d 517 (W.D. Mich. 2024) ........ 34

Bd. of Regents of the Univ. of Houston Sys. v. Houston Coll. of Law, Inc., 214 F. Supp. 3d 573 (S.D. Tex. 2016) ........ 34

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ........ passim

Bethea v. Roizman, No. CIV. 11-254 JBS/JS, 2012 WL 2500592 (D.N.J. June 27, 2012) ........ 19

Boy Scouts of Am. v. Dale, 530 U.S. 640 (2000) ........ 21

Cicchetti v. Morris Cnty. Sheriff's Office, 194 N.J. 563 (2008) ........ 26, 28

Connelly v. Lane Constr. Corp., 809 F.3d 780 (3d Cir. 2016) ........ 10, 23

Cornelius-Millan v. Caribbean Univ., Inc., 261 F. Supp. 3d 143 (D.P.R. 2016) ........ 11

Dale v. Boy Scouts of Am., 160 N.J. 562 (1999) ........ 20

Dale v. Boy Scouts of Am., 308 N.J. Super. 516 (App. Div. 1998) ........ 27

Darensburg v. Metro. Transp. Comm'n, 636 F.3d 511 (9th Cir. 2011) ........ 11

David v. Neumann Univ., 177 F. Supp. 3d 920 (E.D. Pa. 2016) ........ 19

Dixon v. Rutgers, the State Univ. of N.J., 110 N.J. 432 (1988) ........ 23

Doe v. Delie, 257 F.3d 309 (3d Cir. 2001) ........ 31

Doninger v. Niehoff, 527 F.3d 41 (2d Cir. 2008) ........ 34

Estate of Oliva v. State, 579 F. Supp. 2d 643 (D.N.J. 2008) ........................................................ 17

Ex parte Young, 209 U.S. 123 (1908) ........................................................................... 29, 31

Fitchik v. N.J. Transit Rail Operations, Inc., 873 F.2d 655 (3d Cir. 1989) ......................... 29, 30

Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009) .................................................. 9, 18

Gartenberg v. Cooper Union for the Advancement of Sci. & Art, 765 F. Supp. 3d 245 (S.D.N.Y. 2025) ........................................................................................................... 25, 26

Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70, 415 U.S. 423 (1974) ........................................................................................................ 12

Grayson v. Mayview State Hosp., 293 F.3d 103 (3d Cir. 2002) .............................................. 13

Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988) ..................................................... 33

Healy v. James, 408 U.S. 169 (1972) ......................................................................... 2, 32, 33

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997) ................................ 10

Ivan v. County of Middlesex, 595 F. Supp. 2d 425 (D.N.J. 2009) ........................................... 27

Kengerski v. Harper, 6 F.4th 531 (3d Cir. 2021) ..................................................................... 17

Kentucky v. Graham, 473 U.S. 159 (1985) .............................................................................. 31

Kutchinski v. Freeland Cmty. Sch. Dist., 69 F.4th 350 (6th Cir. 2023) .................................. 34

L.W. ex rel. L.G. v. Toms River Reg'l Sch. Bd. of Educ., 189 N.J. 381 (2007) ........................ 21

Landau v. Corp. of Haverford Coll., 780 F. Supp. 3d 548 (E.D. Pa. 2025) ............................. 25

Lau v. Nichols, 414 U.S. 563 (1974) .......... 14

Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587 (1993) .......... 24

Maliandi v. Montclair State Univ., 845 F.3d 77 (3d Cir. 2016) .......... 29, 30

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) .......... 16

Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55 (1978) .......... 20, 27

Perez v. Zagami, LLC, 218 N.J. 202 (2014) .......... 27

Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008) .......... 9

Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739 (1989) .......... 12

Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548 (3d Cir. 2002) .......... 14, 15, 16

Ptaszynski v. Uwaneme, 371 N.J. Super. 333 (App. Div. 2004) .......... 27

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) .......... 35

Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819 (1995) .......... 33

Scheuer v. Rhodes, 416 U.S. 232 (1974) .......... 9

Schmidt v. Skolas, 770 F.3d 241 (3d Cir. 2014) .......... 10

Shariese Abdullah v. Rowan Univ., No. 1:21-CV-19256-RMB-MJS, 2024 WL 4751196 (D.N.J. Nov. 12, 2024) .......... 19

Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1 (2002) .......... 24

StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech., 158 F.4th 1 (1st Cir. 2025) .......... 25, 26

Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) .......... 11

Taylor v. Metzger, 152 N.J. 490 (1998) .......... 24

Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc., 173 F.3d 988 (6th Cir. 1999) .......... 17

Villanova Univ. v. Villanova Alumni Educ. Found., Inc., 123 F. Supp. 2d 293 (E.D. Pa. 2000) .......... 34

Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989) .......... 29, 31

**STATUTES AND RULES**

42 U.S.C. § 1983 .......... passim

42 U.S.C. § 2000d .......... 14

Fed. R. Civ. P. 8(a)(2) .......... 9

Fed. R. Civ. P. 12(b)(6) .......... passim

Fed. R. Civ. P. 12(d) .......... 10

Fed. R. Civ. P. 15(a)(2) .......... 13

Fed. R. Civ. P. 81(c)(1) .......... 12

N.J. CONST. ART. I § 5 .......... 20

N.J. STAT. ANN. §§ 10:5-1 *et seq.* .......... 20

N.J. STAT. ANN. § 10:5-2 .......... 20

N.J. STAT. ANN. § 10:5-3 .......... 21

N.J. STAT. ANN. § 10:5-4 .......... 20

N.J. STAT. ANN. § 10:5-12(e) .......... 26, 27

N.J. STAT. ANN. § 10:5-12(f) .......... 20, 27

N.J. STAT. ANN. § 10:6-2(c) .......... 21, 27

**OTHER AUTHORITIES**

S. Judiciary Comm. Statement to S. No. 1158, 211th Leg. (May 6, 2004) .......... 21

## INTRODUCTION

This case is not just about a name; it is about a public university's decision to deny official recognition to a student group organized around a protected viewpoint, advocacy for Palestinian rights, while simultaneously offering recognition to every other student group at the institution. Defendants attempt to reframe this straightforward case of viewpoint discrimination and animus as a routine administrative naming dispute. The First Amended Complaint ("FAC") tells a different story.

Plaintiffs are current and former New Jersey Institute of Technology (hereinafter "NJIT") students of Palestinian, Central Asian, and Southeast Asian origin and heritage, who sought to form Students for Justice in Palestine, New Jersey Institute of Technology Chapter (hereinafter "SJP-NJIT"), a student organization to advocate for Palestinian human rights. NJIT refused to recognize their group. The stated reason, that the students chose a name shared with a national advocacy organization, is a pretext; NJIT did not object to other student groups whose names are identical or similar to national organizations. NJIT did not even apply a consistent policy. What NJIT objected to was the message: advocacy on behalf of Palestinian liberation.

Defendants' motion to dismiss asks the Court to disregard well-pleaded facts and accept Defendants' preferred characterization of events as true at the pleading stage, the exact opposite of what Rule 12(b)(6) requires. The motion should be denied for three principal reasons.

First, Plaintiffs have plausibly alleged that NJIT's refusal to recognize SJP-NJIT was motivated, at least in part, by discriminatory animus toward Plaintiffs on the basis of their race, and national origin, and ancestry. The FAC alleges a professor publicly likened supporters of Palestine to terrorists; administrators expressed hostility to the national SJP organization's purpose of supporting Palestinian liberation; and NJIT singled out SJP-NJIT for naming scrutiny it did not apply to comparably named organizations. These allegations, taken together, give rise to a plausible inference of discriminatory intent sufficient to survive a motion to dismiss.

Second, Plaintiffs have adequately pleaded First Amendment violations. NJIT's refusal to recognize SJP-NJIT, based on activities of a national organization with the same name, not on any conduct by these Plaintiffs, constitutes viewpoint-based discrimination. Such discrimination is presumptively unconstitutional. The cases Defendants cite involving false or misleading speech are inapposite: the name "Students for Justice in Palestine, NJIT Chapter" is not false. It accurately describes a student group at NJIT that supports justice in Palestine. NJIT's objection to it is an objection to the message: support for Palestine.

Third, the individual defendants are not entitled to qualified immunity. The right of students to form organizations at public universities without viewpoint-based interference has been clearly established since Healy v. James, 408 U.S. 169 (1972). No reasonable university official in 2023 through 2025 could have believed that denying recognition to a student group solely because administrators disliked the national organization with which it shared a name was constitutionally permissible.

For these reasons, Defendants' motion to dismiss should be denied in its entirety.

## PERTINENT FACTS & STATUTES

### The Plaintiffs and Their Organization

Plaintiffs Yahya Habehh (hereinafter "Habehh"), Umair Khan, Usman Ahmad Khwaja, Ibraheem Aljayeh, Ahmad Jamhour (hereinafter "Jamhour"), and Faris Qaddoura are Palestinian-American, Central Asian-American, and Southeast Asian-American students who attended NJIT in Newark, New Jersey. FAC "Parties" ¶¶ 3-14. On or around September 25, 2023, these students founded SJP-NJIT, an organization established to advocate for Palestinian rights and to provide a community for students who share that advocacy on NJIT's campus. FAC "Facts" ¶ 1. From its founding, SJP-NJIT sought formal recognition as an NJIT student organization; a status that would entitle it to the same institutional resources, access to campus facilities, and participation in university life enjoyed by every other recognized student group at NJIT. FAC "Facts" ¶¶ 18-19.

The individual defendants are senior NJIT administrators and a faculty member who participated directly in the repeated denial of SJP-NJIT's recognition applications. They include: David Jones (hereinafter "Jones"), NJIT's chief diversity officer, FAC "Parties" ¶ 15; Marybeth Boger (hereinafter "Boger"), dean of students, FAC "Parties" ¶ 17; Matthew Golden (hereinafter "Golden"), chief marketing and communications officer, FAC "Parties" ¶ 19; Andrew Christ (hereinafter "Christ"), senior vice president for real estate development and capital operations, FAC "Parties" ¶ 21; Latosha Wilson (hereinafter "Wilson"), associate director of campus center operations and conference services, FAC "Parties" ¶ 23; Bruce Bukiet, professor of mathematical studies, FAC "Parties" ¶ 25; Teik Lim (hereinafter "Lim"), president of NJIT, FAC "Parties" ¶ 27; Kathryn Hageman, chief of staff to Lim (hereinafter "Hageman"), FAC "Parties" ¶ 29; and Michael Davis (hereinafter "Davis"), director of student life, FAC "Parties" ¶ 31. Each individual defendant is alleged to have acted in their individual capacity and in connection with their institutional position at NJIT. FAC "Parties" ¶¶ 16, 18, 20, 22, 24, 26, 28, 30, 32.

**NJIT's Immediate Institutional Hostility Toward SJP-NJIT**

Within weeks of SJP-NJIT's establishment, NJIT administrators moved to suppress the organization's visibility on campus before it had even submitted a formal recognition application. On or around October 12, 2023, Bukiet, a professor acting in connection with his institutional position, sent an email to NJIT administration framing Palestinian student advocacy as inherently violent and associated with terrorism, in direct response to a demonstration planned by SJP-NJIT. FAC "Facts" ¶ 2. Less than a month later, on or around November 9, 2023, Bukiet disrupted a campus presentation by Christopher Won (hereinafter "Won"), then the associate director for the office of inclusivity and SJP-NJIT's faculty advisor, aggressively questioning him about purported antisemitism at NJIT and what the university was doing "to protect Jewish students." FAC "Facts" ¶ 3. These communications framed the student members of SJP-NJIT as a threat to campus safety from the moment of the organization's founding.

On or around December 18, 2023, NJIT refused to permit SJP-NJIT to participate in a student involvement fair, a campus event to which recognized and prospective student organizations are customarily invited. FAC "Facts" ¶ 4. Three days later, on December 21, 2023, Jones emailed Won demanding that he remove SJP-NJIT from Won's informal roster of identity-based student organizations, which Won maintained as a personal resource for students. FAC "Facts" ¶ 5. Won responded that the roster was his own informal document and that SJP-NJIT appeared to be "being targeted," noting that other unrecognized clubs remained listed on the same roster without objection from NJIT. FAC "Facts" ¶¶ 6-7. Jones nonetheless demanded that the roster be updated to reflect only officially recognized organizations. FAC "Facts" ¶ 8. Rather than comply by selectively removing SJP-NJIT, Won deleted the entire roster. FAC "Facts" ¶ 9.

On the same date, Won informed Habehh that no NJIT faculty or staff member would be permitted to serve as SJP-NJIT's faculty advisor, a prerequisite for formal recognition under NJIT's

own procedures, effectively blocking the recognition process before a formal application could even be submitted. FAC "Facts" ¶¶ 10-11. Won himself had been serving as SJP-NJIT's faculty advisor until that day. FAC "Facts" ¶ 13.

**First Formal Recognition Application and its Denial**

On or around January 15, 2024, Habehh emailed Boger, Jones, and Davis, among others, memorializing Won's representations regarding the prohibition on faculty advisors for SJP-NJIT and requesting that SJP-NJIT be treated with fairness in light of the widespread discrimination faced by Palestinians in the United States. FAC "Facts" ¶¶ 16-17. On January 17, 2024, SJP-NJIT filed its first formal application for recognition through NJIT's online Highlander Hub portal. FAC "Facts" ¶¶ 18-19.

The application languished for weeks without substantive response. When Habehh followed up on January 31, 2024, NJIT's director of student organizations, Nicholas Marshall, indicated it could take an entire semester to decide whether to approve the application. FAC "Facts" ¶¶ 20-21.

On or around February 13, 2024, Boger and Jones met with Habehh and Jamhour and informed them that SJP-NJIT's application was denied. FAC "Facts" ¶¶ 22-23. When the students emailed Boger asking why NJIT would not permit an SJP chapter on campus, Boger responded in writing on February 19, 2024, that NJIT will not permit a chapter of SJP on campus because SJP is associated with ideologies the university does not want to associate itself with. FAC "Facts" ¶¶ 24-25. This written admission, that the denial was based on NJIT's institutional antipathy toward the national SJP organization, a movement defined by its advocacy for Palestinian rights, is the central evidence of discriminatory and viewpoint-based motivation underlying this litigation.

On or around May 10, 2024, Habehh met with Christ, Golden, and Boger, presenting SJP-NJIT's demands, which included that NJIT permit the establishment of a Palestinian community on campus, refrain from restricting student freedoms, and acknowledge Palestine and Palestinians in

official communications rather than using what Plaintiffs characterized as vague, imperialist, Eurocentric terminology such as “Middle East” and “Gaza region.” FAC “Facts” ¶¶ 26-28. Christ, Golden, and Boger reiterated NJIT’s denial and, critically, NJIT refused at that meeting to recognize Palestinians or Palestine in any official media or university communication. FAC “Facts” ¶¶ 29-30. This refusal to acknowledge Palestinian identity in institutional communications, alongside the denial of recognition, reflects an institutional posture of erasure toward Palestinian national origin and ancestry that permeates the conduct alleged throughout the FAC.

On or around September 9, 2024, after Habehh followed up in writing demanding either approval, written denial with reasons, or a probationary recognition period, FAC “Facts” ¶¶ 31-33, Boger emailed Habehh that NJIT would not officially recognize SJP as a student organization due to “the history of disruptions and policy violations supported by [the national chapter of SJP] at other universities.” FAC “Facts” ¶ 34.

**Hostile Treatment of SJP-NJIT Members on Campus**

While SJP-NJIT’s recognition application remained pending, individual members of the organization were subjected to hostile treatment by NJIT staff in their day-to-day interactions on campus. On or around September 12, 2024, Wilson, NJIT’s associate director of campus center operations, yelled at SJP-NJIT members who had simply asked for tape in the campus center, telling them that they “are not entitled to anything” from NJIT. FAC “Facts” ¶¶ 35-36. On January 22, 2025, Wilson screamed at SJP-NJIT members in the middle of NJIT’s campus center for using a table. unaware, as the FAC expressly alleges, that the organization that had booked the table had given the SJP-NJIT members permission to use it. FAC “Facts” ¶¶ 37-38. Wilson’s conduct did not occur in a vacuum; it occurred against the backdrop of two years of institutional denial and in the specific context of NJIT’s sustained campaign to exclude SJP-NJIT members from full participation in campus life.

**Second Recognition Campaign and its Denial**

In the 2025 to 2026 academic year, a new president was elected to lead SJP-NJIT. FAC ¶ 39. NJIT's Student Senate introduced a new Recognized Student Organization Constitution Template, with which SJP-NJIT complied. FAC "Facts" ¶ 40. On September 14, 2025, the new SJP-NJIT president submitted a fresh application through Highlander Hub. FAC "Facts" ¶ 41.

Jones reached out within days to schedule a meeting to discuss the application. FAC ¶ 42. On October 3, 2025, the new SJP-NJIT president and vice president met virtually for approximately one hour with Jones, Davis, and Khadr, NJIT's director of student organizations. FAC "Facts" ¶¶ 43-44. During that meeting, the new president explained both the significance of SJP-NJIT's name to the organization and that SJP-NJIT has no affiliation with the national chapter of SJP. FAC "Facts" ¶¶ 45-46. Jones nonetheless indicated that NJIT would not recognize SJP-NJIT regardless of the absence of national affiliation, and that NJIT would only recognize the organization under a different name. FAC "Facts" ¶¶ 47-48. This admission (i.e., that the name restriction was categorical and untethered to any actual affiliation concern) is itself powerful evidence that the objection was to the political and advocacy identity the name represents, not to any genuine risk of confusion.

Following the meeting, the new SJP-NJIT president emailed the meeting participants questioning why SJP-NJIT was being treated differently than other NJIT organizations. FAC "Facts" ¶ 50. Defendant Boger acknowledged receipt and promised to be "in touch shortly," but took no substantive action. FAC "Facts" ¶ 51.

On October 17, 2025, the new president and vice president met in person with Boger and Khadr. During that meeting, Boger made a series of admissions that are central to this case. She explained that NJIT was now "not as concerned" about the national SJP chapter given a recently implemented ceasefire between Israel and the Palestinian resistance, a statement that directly ties NJIT's institutional hostility toward SJP-NJIT to Palestinian people, and thus to the Palestinian

national origin and ancestry of the organization's members. FAC "Facts" ¶ 54. Boger further acknowledged that NJIT "usually plays no role in the approval of new organizations," confirming that SJP-NJIT was subjected to a level of administrative scrutiny that NJIT does not ordinarily apply to student organization applicants. FAC ¶ 55. Most significantly, Boger admitted that she personally instructed the NJIT office of student involvement and leadership not to approve SJP-NJIT's application. FAC "Facts" ¶ 56.

On October 21, 2025, the new SJP-NJIT president and vice president met with Hageman and Christ, along with Khadr. FAC "Facts" ¶ 59. The substance of that meeting further exposes the discriminatory and unconstitutional basis for NJIT's conduct. Hageman stated that NJIT's concern was that SJP-NJIT shared its name with the national SJP chapter, which had "purportedly caused disruptions." FAC "Facts" ¶ 60(a). Hageman also expressed concern that recognizing SJP-NJIT could result in NJIT losing federal funding and that students could lose their visas if the application were approved, targeting the immigration status of the students, a concern inseparable from their national origin and ancestry. FAC "Facts" ¶¶ 60(b)-(c). Christ suggested the organization change its name. FAC "Facts" ¶ 60(d). When the new president explained the name's significance and clarified that the national SJP is not affiliated with Hamas, Christ nevertheless directly correlated the national SJP chapter to Hamas. FAC "Facts" ¶¶ 60(g)-(i). This association of Palestinian student advocacy with terrorism, echoing Bukiet's 2023 email, is the clearest evidence in the record of the discriminatory animus underlying NJIT's institutional conduct.

On October 28, 2025, Davis formally denied SJP-NJIT's September 14, 2025 application through Highlander Hub, citing "concerns from the university" as relayed through Boger. FAC "Facts" ¶¶ 61-62. On November 14, 2025, Davis denied SJP-NJIT's third application as well. FAC "Facts" ¶ 66. NJIT never responded to the new SJP-NJIT president's written request for the specific reasons and responsible individuals behind the denial. FAC "Facts" ¶¶ 63-68.

To date, SJP-NJIT remains unrecognized as a student organization at NJIT. FAC "Facts" ¶ 69.

**Procedural History**

Plaintiffs filed their initial Complaint on November 18, 2025, in the Superior Court of New Jersey, Law Division, Essex County, under docket number L-8839-25, asserting claims exclusively under New Jersey law. On January 26, 2026, Plaintiffs filed the FAC, adding Defendants Lim, Hageman, and Davis and asserting federal claims under 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964. Defendants then removed the action to this Court, and now move to dismiss the FAC in its entirety. Their motion should be denied.

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a party to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss pursuant to said rule tests the legal sufficiency of a complaint, not the merits of the case. *See* Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). To survive a motion to dismiss, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In evaluating a Rule 12(b)(6) motion, the Court must accept as true all well-pleaded factual allegations contained in the complaint and draw all reasonable inferences in favor of the non-moving party. *See* Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009); Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).

The Supreme Court's decisions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), establish the current governing pleading standard. A complaint must contain "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). A claim is facially plausible "when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

Plausibility does not require probability; it requires only that the complaint pleads "enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting the claim. Twombly, 550 U.S. at 556; Connelly v. Lane Constr. Corp., 809 F.3d 780, 789 (3d Cir. 2016). A complaint may proceed even where the Court believes that actual proof of the alleged facts is improbable, or where recovery is very remote and unlikely, so long as the complaint is not so implausible on its face as to warrant dismissal. *See* Twombly, 550 U.S. at 556.

Iqbal established a two-step analytical framework for evaluating the sufficiency of a complaint. Iqbal, 556 U.S. at 679. At step one, the Court identifies and sets aside any pleadings that consist of no more than legal conclusions, which are not entitled to the assumption of truth. *See* id. "Threadbare recitals of the elements of a cause of action and mere conclusory statements do not suffice." Id. at 678. At step two, the Court assumes the veracity of the remaining well-pleaded factual allegations and determines whether, taken together, they plausibly give rise to an entitlement to relief. Id. at 679.

Moreover, the Court's review on a motion to dismiss is not completely limited to the four corners of the complaint. The Court may consider documents attached to the complaint, documents that are integral to or explicitly relied upon in the complaint, and matters of public record, without converting the motion into one for summary judgment. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997); Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014). However, "where matters outside the pleadings are presented to and not excluded by the Court" in connection with a motion to dismiss, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

In discrimination cases in particular, plaintiffs ordinarily cannot be expected to allege the specific details of the discriminatory scheme before discovery. *See* Connelly, 809 F.3d at 788. In the

context of employment discrimination: "[t]he McDonnell Douglas framework -- which requires the plaintiff to show (1) membership in a protected group, (2) qualification for the job in question, (3) an adverse employment action, and (4) circumstances supporting an inference of discrimination -- is an evidentiary standard, not a pleading requirement." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 (2002); *see also* Darensburg v. Metro. Transp. Comm'n, 636 F.3d 511, 519 (9th Cir. 2011) ("We look to Title VII disparate impact analysis in analyzing Title VI claims"); Cornelius-Millan v. Caribbean Univ., Inc., 261 F. Supp. 3d 143, 150 (D.P.R. 2016) (Title VII burden-shifting framework is applied to Title VI retaliation claims).

## ARGUMENT

### I. THE FEDERAL PLEADING STANDARD SHOULD NOT BE MECHANICALLY APPLIED TO COUNTS THAT WERE DRAFTED AND FILED IN STATE COURT UNDER NEW JERSEY'S MORE LIBERAL PLEADING STANDARD, AND DISMISSAL OF ANY COUNT SHOULD BE WITHOUT PREJUDICE WITH LEAVE TO AMEND.

This case was not born in federal court. Plaintiffs filed their initial Complaint on November 18, 2025, in the Superior Court of New Jersey, Law Division. At that time, the Complaint asserted claims exclusively under New Jersey law. No federal claims were asserted. Plaintiffs filed the First Amended Complaint on January 26, 2026, adding three additional defendants and, for the first time, asserting claims under federal law, including Title VI of the Civil Rights Act of 1964 and 42 U.S.C. § 1983. Defendants then removed the action to this Court on the basis of federal question jurisdiction.

The consequence of that procedural history is significant and largely overlooked in Defendants' brief. The state law counts were drafted, filed, and served in the Superior Court of New Jersey under the pleading standards of New Jersey practice. They were never intended to satisfy the federal pleading standard articulated in Iqbal and Twombly. Defendants now seek to hold those state-court-drafted pleadings to a federal standard that Plaintiffs had no reason to anticipate at the time they were prepared and filed. That is fundamentally unfair, and it warrants either a more forgiving

application of the plausibility standard to the state law counts or, at a minimum, leave to amend should this Court find any count deficiently pled.

The pleading standard applicable in the Superior Court of New Jersey differs materially from the standard this Court applies under Rule 12(b)(6). New Jersey Court Rule 4:6-2(e) permits dismissal for failure to state a claim only where, after an indulgent examination of the complaint, no cause of action can be sustained. Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746 (1989). The New Jersey Supreme Court has repeatedly emphasized that the standard is "a generous one," requiring the court to "search[] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim." Id. (internal quotation marks omitted).

That standard is in significant tension with the federal plausibility standard, under which a complaint must plead "enough facts to state a claim to relief that is plausible on its face" and must allege more than a "formulaic recitation of the elements." Twombly, 550 U.S. at 570; Iqbal, 556 U.S. at 678. As set forth above, under New Jersey practice, a complaint survives a motion to dismiss if any cause of action can be gleaned from its allegations, however obscurely stated. Conversely, under the federal standard, survival requires affirmative factual allegations giving rise to a plausible inference of each element of the claim. These are meaningfully different standards, and a complaint optimized for one will not necessarily satisfy the other.

Plaintiffs acknowledge Rule 12(b)(6), not state pleading standards, govern motions to dismiss in federal court following removal. *See* Fed. R. Civ. P. 81(c)(1). And, the Federal Rules of Civil Procedure apply in federal court regardless of the forum in which an action originated. *See* Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70, 415 U.S. 423, 438 (1974).

Plaintiffs do not ask this Court to disregard binding authority; they ask instead for two things. First, they ask that in applying Rule 12(b)(6) to state law counts originally filed in state court, this Court apply the plausibility standard with appropriate recognition that those counts were drafted under a materially different and more liberal standard, and that ambiguities and gaps in the pleading that would not have mattered in state court should not be held against Plaintiffs without an opportunity to conform their pleading to the federal standard. Second, and most importantly, they ask that if this Court finds any count deficiently pled under Rule 12(b)(6), dismissal be without prejudice and with leave to amend.

The Third Circuit has been explicit that leave to amend should be freely granted, particularly where a complaint is dismissed for failure to satisfy the federal pleading standard and there is no indication that amendment would be futile. *See* Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires"). The circumstance presented here, state law claims drafted for state court, removed to federal court, then challenged under a more demanding standard, is precisely the circumstance in which leave to amend is most warranted. Plaintiffs should not be deprived of their day in court on their New Jersey law claims merely because those claims were pleaded to the standard of the forum in which they were originally filed, a forum Defendants chose to forsake through removal.

Defendants' request for dismissal with prejudice is particularly inappropriate in this context. Dismissal with prejudice is a drastic remedy reserved for circumstances where, for example, amendment would be futile or where the plaintiff has engaged in bad faith. Id. Neither circumstance is present here. Plaintiff's state law claims are meritorious, the factual record supporting them is substantial, and any pleading deficiencies attributable to the difference in standards between state and federal court are readily curable by amendment.

Accordingly, to the extent this Court is inclined to find any of Plaintiffs' state law counts deficient under Rule 12(b)(6), Plaintiffs respectfully request that dismissal be without prejudice and that Plaintiffs be granted leave to file a Second Amended Complaint conforming their state law allegations to the federal pleading standard.

## II. PLAINTIFFS ADEQUATELY PLEADED CLAIMS FOR DISCRIMINATION.

### a. Count Six adequately states a claim under Title VI against NJIT.

Title VI provides that no person shall, on the ground of race, color, or national origin, be subjected to discrimination under any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d. "Discrimination is barred which has that effect even though no purposeful design is present: a recipient may not . . . utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin." Lau v. Nichols, 414 U.S. 563, 568 (1974) (internal citations removed).

To state a Title VI claim, a plaintiff must plausibly allege intentional discrimination, that is, that a protected characteristic was a 'motivating factor' in the challenged decision. *See* Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 562-63 (3d Cir. 2002). "Owing perhaps to the principle that questions of intent and state of mind are ordinarily not amenable to summary adjudication . . . courts have only reluctantly upheld the Rule 12(b)(6) dismissal of a claim alleging unlawful discrimination in the adoption of an otherwise facially neutral policy." Id. at 563.

Defendants advance three arguments for dismissing the Title VI claim: (1) individuals cannot be sued under Title VI; (2) Plaintiffs have not plausibly alleged intentional discrimination; and (3) the name restriction was content-neutral. The first argument has some merit as to individual defendants, but the Title VI claim against NJIT is soundly pleaded, so the second and third arguments fail.

#### i. Individual Defendants are not liable under Title VI.

Plaintiffs concede Title VI does not provide for individual liability against persons who are not themselves recipients of federal funds. Defendants are correct on this narrow point, and Plaintiffs do not press the Title VI claims as to the individual defendants. However, the Title VI claim against NJIT, which is the primary and essential defendant on this count, survives dismissal for the reasons set forth below.

ii. Plaintiffs plausibly alleged intentional discrimination by NJIT.

Defendants argue the FAC contains only "conclusory assertions" of discriminatory intent and that NJIT's objection to the name was based on reputational concerns about the national SJP organization, not race or national origin. This argument distorts both the legal standard and the factual allegations.

The FAC pleads the following facts supporting an inference of discriminatory intent:

First, Professor Bukiet, operating within NJIT's administrative community and communicating directly with the administrators who would rule on Plaintiffs' applications, publicly likened Palestine solidarity to terrorism. *See* FAC "Facts" ¶ 2. This statement was made to NJIT administrators shortly before the first application was filed and reflected a perception, shared within NJIT's leadership, that Palestinian advocacy is inherently suspect and violent.

Second, the stated reason for denying the application, that NJIT does not want to associate with the ideologies of SJP, is on its face an objection to an organization whose core purpose is Palestinian liberation advocacy. That purpose is inseparable from the race and national origin of those who advocate for it. Again, facially neutral policies that are motivated by animus toward the identity of a protected class constitute actionable discrimination. *See* Pryor, 288 F.3d at 567.

Third, NJIT offered no neutral, consistent naming policy. It did not identify other student groups whose names mirrored national organizations and demand changes. Its objection was specific

to SJP. This selective treatment of a Palestinian student group, while comparable organizations were given recognition under their chosen names, supports an inference of discriminatory intent. *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973) (under Title VII, comparative evidence of differential treatment supports inference of discrimination).

Fourth, Defendant Wilson's hostile confrontation of Plaintiffs, telling Palestinian and other Asian students they were "not entitled to anything" reflects institutional hostility directed at these students in particular. FAC "Facts" ¶ 36. While Defendants attempt to characterize this as a neutral space dispute, the FAC describes targeted hostility. At this stage, the Court must draw all reasonable inferences in Plaintiffs' favor.

Taken together, these allegations plausibly support the inference that NJIT's decision to deny SJP-NJIT recognition was motivated, at least in part, by discriminatory animus toward Plaintiffs' race and national origin.

Moreover, the national Students for Justice in Palestine organization is, by its own description, a movement organized around Palestinian liberation advocacy. NJIT's characterization of that organization as "disruptive" and its use of that characterization as the justification for denying recognition to a student group affiliated with Palestinian advocacy is not a race-neutral, content-neutral determination; it is a judgment about the political and social views associated with Palestinian identity. Facially neutral justifications that track the expressive characteristics of a protected group can constitute circumstantial evidence of discriminatory motive. *See* Pryor, 288 F.3d at 563-64 (recognizing that facially neutral policies applied disproportionately to a protected group can support a determination of invidious discriminatory purpose). At the pleading stage, Plaintiffs are entitled to have the inference drawn in their favor that NJIT's objection to SJP's "disruptive" associations and policies was a proxy for its objection to Palestinian liberation, Palestinian identity, and advocacy of SJP's members.

Defendants argue that because SJP-NJIT was open to all students regardless of race, NJIT's denial cannot constitute race or national origin discrimination. That argument is legally and factually wrong.

Title VI does not require that an organization be exclusively composed of members of a single protected class; it protects individuals from discrimination on the basis of their race, color, or national origin. The individual Plaintiffs are Palestinian-American and Central/Southeast Asian-American students (i.e., members of a protected class under Title VI's racial and national origin protections). The organization they sought to form was defined precisely by advocacy on behalf of Palestinian people, a group whose identity is inextricably bound up with Palestinian ethnicity, national origin, and ancestry. And, courts have expanded discrimination law to protect individuals who are the victims of discriminatory animus towards third persons with whom the individuals associate. *See* Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc., 173 F.3d 988, 994 (6th Cir. 1999) (holding Title VII supports claims for associational discrimination); Kengerski v. Harper, 6 F.4th 531, 537 (3d Cir. 2021); *see also* Estate of Oliva v. State, 579 F. Supp. 2d 643, 666 (D.N.J. 2008) (individuals who are not members of a minority may recover under 42 U.S.C. § 1981 if the discrimination suffered was caused by their association with or advocacy on behalf of minorities).

Ultimately, the FAC alleges that NJIT singled out SJP-NJIT, an organization whose very name, mission, and membership are identified with Palestinian identity, for denial while recognizing other student organizations, including organizations associated with national networks or controversial advocacy positions. That differential treatment of an organization defined by its members' protected characteristics plausibly supports an inference of discriminatory intent.

iii. NJIT's name restriction was not content neutral.

Defendants' argument that the name restriction was "content neutral" because NJIT would have recognized the group under a different name is unpersuasive at the pleading stage. That NJIT

was willing to recognize a neutered version of the organization, stripped of its ideological identification, does not negate the inference that the identification itself was rejected because of what it represented, and who it represented. Requiring Palestinian and other Asian students to abandon their identity as a condition of receiving the same benefits available to every other student group is not neutral, it is discriminatory.

The specific name NJIT demanded be removed, "Students for Justice in Palestine," is inseparable from the Palestinian identity of the organization's members and their advocacy. NJIT's willingness to recognize a group advocating for Palestinian rights under a sanitized, identity-stripped name while refusing to recognize the same group under a name that explicitly identifies it with Palestinian advocacy is not evidence of non-discrimination. Indeed, it is evidence of precisely the kind of discrimination Title VI prohibits: conditioning access to a university benefit on the suppression of the protected identity characteristics that define the applicants.

Defendants isolate each allegation in the FAC and argue that no single allegation, standing alone, establishes discriminatory intent. That analytical approach is contrary to the rule that a complaint must be assessed as a whole, with all reasonable inferences drawn in the plaintiff's favor. *See* Fowler, 578 F.3d at 210-11.

Read as a whole, the FAC alleges: a professor emailed administrators characterizing supporters of Palestine as terrorists and questioning what NJIT was doing to protect Jewish students from Palestinian advocacy, framing the students' very presence as a security threat; NJIT administrators refused to include SJP-NJIT on lists of student organizations and failed to engage with its recognition applications in good faith; NJIT's director of campus operations berated Plaintiffs for using common space while they were seeking recognition; NJIT officials invoked the "disruptive" reputation of a national organization defined by Palestinian identity as the justification for denial; and NJIT conditioned recognition on the removal of the specific phrase identifying the organization with

Palestinian national origin and advocacy. These allegations, taken together, describe an institutional pattern of hostility to the presence and recognition of Palestinian student identity on campus, a pattern that plausibly supports an inference of intentional discrimination on the basis of race and national origin under Title VI.

The cases Defendants cite, two of which are unpublished and therefore nonprecedential, involved bare conclusory assertions of discrimination wholly unsupported by any factual allegations of differential treatment or hostile conduct. *See* Shariese Abdullah v. Rowan Univ., 1:21-CV-19256-RMB-MJS, 2024 WL 4751196 (D.N.J. Nov. 12, 2024); David v. Neumann Univ., 177 F. Supp. 3d 920 (E.D. Pa. 2016); and Bethea v. Roizman, CIV. 11-254 JBS/JS, 2012 WL 2500592 (D.N.J. June 27, 2012).

In Abdullah, the plaintiff alleged her professors refused to help her with her doctoral dissertation based upon their inability to relate to her, as the topic of her dissertation involved race, and the professors were not the same race as her. 2024 WL 4751196 at *39. In David, the plaintiff did not sufficiently plead that the university had actual knowledge of racist comments made by professors. 177 F. Supp. 3d at 927. In Bethea, the plaintiffs offered a conclusory allegation that they were discriminated against on the basis of race and failed to substantiate this allegation with any plausible factual basis. 2012 WL 2500592, at *45.

This case is categorically different. Here, by contrast, and as set forth in Point II(a)(ii), *supra*, Plaintiffs allege multiple specific incidents of discriminatory statements and conduct by NJIT officials in the relevant time period, combined with a selective application of a purportedly neutral policy. The university, including the President, was well aware of the conduct and sanctioned it, per the FAC. This is more than sufficient under Twombly and Iqbal.

**b. Plaintiffs adequately pleaded claims under the LAD and CRA.**

i. Count One adequately states a claim.

Defendants repeat their central refrain: because NJIT offered to recognize the organization under a different name, no discrimination occurred. As argued at length in Point II(a)(iii), *supra*, that argument is wrong as a matter of law and logic.

The Law Against Discrimination (heretofore and hereinafter "LAD"), N.J. STAT. ANN. §§ 10:5-1 *et seq.*, was enacted "for the protection of the public safety, health and morals and to promote the general welfare and in fulfillment of the provisions of the Constitution of this State guaranteeing civil rights." N.J. STAT. ANN. § 10:5-2; *see* N.J. CONST. ART. I § 5 (prohibits discrimination in exercise of civil rights).

It is unlawful discrimination:

> [f]or . . . any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof, or directly or indirectly to publish, circulate, issue, display, post or mail any written or printed communication, notice, or advertisement to the effect that any of the accommodations, advantages, facilities, or privileges of any such place will be refused, withhold from, or denied to any person on account of the race, . . . color, national origin, ancestry . . . or that the patronage or custom thereat of any person of any particular race, . . . color, national origin, ancestry . . . is unwelcome, objectionable or not acceptable, desired or solicited[.]
>
> N.J. STAT. ANN. § 10:5-12(f)(1).
>
> All persons shall have the opportunity . . . to obtain all the advantages, facilities, and privileges of any place of public accommodation . . . and other real property without discrimination because of race, . . . color, national origin, ancestry . . . This opportunity is recognized as and declared to be a civil right.
>
> N.J. STAT. ANN. § 10:5-4.

"The eradication of unlawful discrimination from our society has always been of predominant concern in our State." Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 80 (1978). "[T]he overarching goal of the [LAD] is nothing less than the eradication of the cancer of discrimination." Dale v. Boy Scouts of Am., 160 N.J. 562, 584 (1999) (citations and quotations omitted), *rev'd sub nom. and only as*

*applied and only on First Amendment grounds* Boy Scouts of Am. v. Dale, 530 U.S. 640 (2000). This is because discrimination threatens the rights and privileges of New Jersey residents, "menaces the institutions and foundations of a free democratic State[,]" causes people to "suffer personal hardships, and [causes] the State [to suffer] a grievous harm." N.J. STAT. ANN. § 10:5-3.

To rid New Jersey of discrimination, the LAD must "be liberally construed." N.J. STAT. ANN. § 10:5-3. Complying with this legislative directive, New Jersey courts have historically and consistently interpreted and applied the "LAD with that high degree of liberality which comports with the preeminent social significance of its purposes and objects." Dale, 160 N.J. at 585 (internal quotations omitted).

The New Jersey Civil Rights Act (heretofore and hereinafter "CRA") was enacted in 2004 for the purpose of "provid[ing] the citizens of New Jersey with a State remedy for deprivation of or interference with the civil rights of an individual." S. Judiciary Comm. Statement to S. No. 1158, 211th Leg. 1 (May 6, 2004).

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J. STAT. ANN. 10:6-2(c).

The LAD's "but for" causation standard, as articulated in L.W. ex rel. L.G. v. Toms River Regional School Board of Education, 189 N.J. 381, 402 (2007), asks whether the discriminatory conduct would not have occurred but for the plaintiff's protected characteristic. The relevant question is thus not whether NJIT offered an alternative; it is whether the specific condition NJIT imposed, the rejection of "Students for Justice in Palestine" as the organization's name, was imposed because of the Palestinian national origin and ancestry of the Plaintiffs and their advocacy.

The answer is plausibly yes. The name "Students for Justice in Palestine, New Jersey Institute of Technology Chapter" is not a generic organizational label. It is an expression of Palestinian identity, Palestinian advocacy, and solidarity with the Palestinian people. The word "Palestine" is not merely a geographic reference; it is the name of a nation whose people have a distinct national origin, ancestry, language, culture, and history recognized under international law and by the overwhelming consensus of the international community. To be Palestinian is to hold a specific race, national origin, and ancestry. An organization that places "Palestine" at the center of its name is, by definition, an organization defined by and identified with that race, national origin, and ancestry.

This is not an abstract or inferential connection; it is the explicit and stated purpose of the organization. The new SJP-NJIT president personally explained to NJIT administrators the significance of the name to the organization and its members. *See* FAC "Facts" ¶ 45. NJIT's administrators understood precisely what the name meant and to whom it referred. Their demand that the name be changed was therefore a demand that Plaintiffs excise the Palestinian identity from their organization as a precondition for receiving the same institutional benefit available to every other student group on campus. The demand that Plaintiffs abandon that name as a condition of receiving institutional recognition extended to other student organizations is, on its face, a condition imposed because of the protected characteristics of Plaintiffs and their organization. And, that is precisely what the LAD prohibits in its most direct form.

Defendants also argue that Plaintiffs have not alleged they were treated differently than similarly situated students. But the FAC, read as a whole, alleges that NJIT recognized other student organizations, including organizations affiliated with national networks and controversial advocacy positions, without subjecting their names or associations to scrutiny comparable to what SJP-NJIT endured. FAC "Facts" ¶¶ 7, 50. The inference that NJIT singled out SJP-NJIT for heightened scrutiny, protracted denial, and a name-change demand that was not applied to other organizations is a

reasonable inference from the facts alleged, and Plaintiffs are entitled to that inference at the pleading stage. Discovery will bear out the full picture of comparator organizations; Plaintiffs are not required to identify with specificity and/or plead that picture in its entirety before a single document has been produced or a single deposition taken.

Finally, the Dixon v. Rutgers, the State Univ. of N.J. "more likely than not" standard governs the ultimate burden of proof, not the pleading standard. 110 N.J. 432, 443 (1988). At the Rule 12(b)(6) stage, Plaintiffs need only allege facts that plausibly support an inference of discriminatory motivation, not establish that discrimination is more probable than an innocent explanation. Connelly, 809 F.3d at 786. The FAC clears that bar.

ii. Count Two adequately states a claim against Defendant Jones.

Defendants argue Jones' demand for removal of SJP-NJIT from the roster of student organizations was simply an accurate administrative act reflecting the organization's unrecognized status. This argument fails. Put simply, the motivation for Jones' act is a factual question that cannot be resolved on a motion to dismiss. The FAC alleges that Jones specifically targeted SJP-NJIT for removal from the student organization roster in the context of the broader institutional pattern of hostility toward this organization and its members. Whether that act was a race- and national origin-neutral ministerial determination or a discriminatory act motivated by the identity of SJP-NJIT's members is a question of fact, not a question to be resolved against Plaintiffs on the pleadings.

iii. Count Three adequately states a claim against Defendant Wilson.

Defendants characterize Wilson's conduct as a neutral administrative correction of a space-use conflict. The FAC alleges something more. Wilson's confrontation of Plaintiffs, screaming at them that they were "not entitled to anything" from NJIT, occurred in the specific context of Plaintiffs' efforts to be recognized as a student organization and participate in campus life on equal terms with other students. FAC ¶¶ 35-37. When viewed in the context of the broader pattern of institutional

hostility alleged throughout the FAC, Wilson's conduct is not an isolated, race-neutral administrative interaction; it is one episode in a course of conduct directed at Palestinian students seeking institutional recognition, and it contributes to the hostile environment claim that runs through Counts One through Four.

Defendants also contend a single incident of yelling cannot be "sufficiently severe or pervasive" to create a hostile environment. But, the LAD hostile environment standard does not evaluate incidents in isolation; it requires assessment of the totality of the circumstances. *See* Lehmann v. Toys 'R' Us, 132 N.J. 587, 607 (1993) (finding the determination of whether conduct is "severe or pervasive" enough to create a hostile environment must consider "the cumulative effect of the various incidents" rather than assessing each incident individually as if they were hermetically sealed from the others). And, a single severe incident can create a hostile environment when evaluated in context *See* Taylor v. Metzger, 152 N.J. 490, 498-99 (1998). Ultimately, Wilson's conduct does not stand alone; it is part of the cumulative pattern alleged in the FAC, and it is properly considered as a component of the overall hostile environment claim.

iv. Count Four states a timely and actionable claim against Defendant Bukiet.

Defendants argue Count Four is time-barred because Bukiet's October and November 2023 conduct predates the November 18, 2025, filing of this action by more than two years. However, the continuing violations doctrine preserves the timeliness of these allegations as part of a continuous course of discriminatory conduct.

Under New Jersey law, the continuing violations doctrine applies where the plaintiff can demonstrate that the discriminatory acts are part of an ongoing pattern or practice of discrimination rather than isolated incidents. *See* Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 6-7 (2002). The doctrine is particularly applicable where, as here, the individual acts are part of a continuous course of institutional hostility directed at a specific group of students. Bukiet's 2023 emails and

conduct are not isolated historical events; they are the opening acts of the same discriminatory course of conduct that continued through NJIT's repeated denials of SJP-NJIT's recognition applications in 2024 and 2025. The most recent acts in that continuous pattern: the October 2025 denial and the events immediately preceding this filing, are well within the limitations period. Because Bukiet's earlier conduct is part of the same continuing violation, it is preserved under the doctrine.

Separately, Defendants invoke Landau v. Corporation of Haverford College, 780 F. Supp. 3d 548 (E.D. Pa. 2025), for the proposition that hostile environment claims cannot rest on statements not directed at or known to the plaintiffs. But, the FAC does not allege that Plaintiffs were unaware of Bukiet's communications; it alleges that Bukiet sent an email to NJIT administration characterizing supporters of Palestine as terrorists and publicly confronted an adviser supporting Plaintiffs during a presentation attended by members of the university community. FAC ¶¶ 2-3. These are not back-channel private communications unknown to anyone; they are institutional acts within a university environment where information about administrative conduct routinely reaches students. Whether Plaintiffs had actual knowledge of Bukiet's statements is a factual question that cannot be resolved against them on a motion to dismiss.

Moreover, even under Landau, the question is whether plaintiffs were "personally aware of the specific instances of harassment[,]" not whether Bukiet's email was addressed to each plaintiff. Landau, 780 F. Supp. 3d at 559. The FAC alleges an institutional climate of hostility toward Palestinian students, of which Bukiet's conduct is one manifestation, and of which Plaintiffs were aware.

Defendants invoke StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech., 158 F.4th 1 (1st Cir. 2025), and Gartenberg v. Cooper Union, 765 F. Supp. 3d 245 (S.D.N.Y. 2025), for the proposition that political advocacy directed at one side of a political conflict cannot constitute actionable harassment. However, those cases are distinguishable from the facts at hand and do not control here.

StandWithUs addressed whether criticism of Israeli government policy during protests constituted antisemitism sufficient to create a hostile environment for Jewish students, a question about the relationship between speech and protected religious and ethnic identity. 158 F.4th at 18. Gartenberg addressed the constitutional limits on Title VI hostile environment liability for pure speech on matters of public concern, and found the plaintiff sufficiently alleged a hostile educational environment claim under Title VI based on incidents unprotected by the First Amendment. 765 F. Supp. 3d at 264.

Notably, neither case addressed whether a university administrator's characterization of a Palestinian student group's members as terrorists, delivered to university administration in the context of opposing that group's recognition, constitutes discriminatory conduct contributing to a hostile environment.

Bukiet's conduct is not mere political commentary about a geopolitical conflict. It is a university professor and administrator, writing to university administration, equating students who advocate for Palestinian rights, students defined by their Palestinian race, national origin, and ancestry, with terrorists, for the evident purpose of influencing the university's decision whether to recognize their organization. That conduct, in that institutional context and directed at those students because of their protected characteristics, is precisely what the LAD is designed to reach. Bukiet's conduct is not shielded from scrutiny by the First Amendment or by the political opinion doctrine because it is not abstract political speech; it is targeted institutional conduct directed at identifiable students on the basis of their race, national origin, and ancestry in the context of a university benefit determination.

v. The LAD's aiding and abetting framework is inapplicable to this matter.

It is true that, in the employment discrimination context, for supervisory employees of an employer, individual liability under the LAD does run through the aiding and abetting mechanism of N.J. STAT. ANN. § 10:5-12(e). *See* Cicchetti v. Morris County Sheriff's Office, 194 N.J. 563, 594 (2008).

And, non-supervisory employees generally cannot be held individually liable in the employment discrimination context. Ivan v. County of Middlesex, 595 F. Supp. 2d 425, 462 (D.N.J. 2009).

However, the LAD's prohibition on discrimination in places of public accommodation, N.J. STAT. ANN. § 10:5-12(f), is analytically distinct from its employment provision. *See* Peper, 77 N.J. at 67 ("[t]he prohibition of discrimination in relation to public accommodation is functionally distinct from the ban on employment discrimination"). The aiding and abetting framework of N.J. STAT. ANN. § 10:5-12(e) has never been formally extended to public accommodation discrimination claims. Indeed, the LAD broadly prohibits discrimination in places of public accommodation, and its reach is not limited to specific "places" but extends to the individuals who own, operate, or manage such places. *See* Ptaszynski v. Uwaneme, 371 N.J. Super. 333, 345-46 (2004) (quoting Dale v. Boy Scouts of Am., 308 N.J. Super. 516, 533 (App. Div.1998)).

Moreover, as set forth, *supra*, the CRA provides a direct cause of action against any person who, under color of law, interferes with the exercise of rights secured by the New Jersey Constitution or laws of New Jersey. *See* N.J. STAT. ANN. § 10:6-2(c). The CRA is modeled on 42 U.S.C. § 1983 and imposes direct individual liability on state actors who violate protected rights, without the intermediary of an aiding and abetting theory. *See* Perez v. Zagami, LLC, 218 N.J. 202, 213 (2014). Because the individual defendants here are government actors at a public university acting under color of state law, the CRA provides a direct route to individual liability.

Notwithstanding the foregoing, Defendants contend that individual liability fails because Plaintiffs have not specifically alleged supervisory status or active and purposeful assistance in NJIT's discrimination. Setting aside the fact that the aiding and abetting framework does not apply, even if the Court were to extend that framework to places of public accommodation, the supervisory authority of each Defendant is a factual question that cannot be resolved at the pleading stage.

The FAC alleges that Jones, as a named administrator, exercised institutional authority over student organization recognition, the very employment benefit at issue. Again, whether that authority constitutes supervisory status within the meaning of the LAD's aiding and abetting framework is not a question that can be resolved in Defendants' favor without a factual record. The FAC's allegations that Jones affirmatively acted to exclude SJP-NJIT from institutional recognition are sufficient to raise the inference of supervisory authority and active participation in the discrimination at this stage.

As with Jones, Wilson's supervisory authority is a factual question not amenable to resolution on a motion to dismiss. The FAC alleges that Wilson, as director of campus operations, exercised institutional authority over students' access to campus space and facilities, authority directly relevant to the conditions of Plaintiffs' participation in campus life. Whether that constitutes supervisory status is a factual determination for which discovery is required.

More broadly, the FAC identifies each individual defendant by name and title, alleges their participation in the meetings and decisions through which SJP-NJIT's applications were denied, and places their conduct in the context of NJIT's broader discriminatory course of conduct. That is sufficient to allege the knowing and substantial assistance required for aiding and abetting liability under Cicchetti.

The precise allocation of decision-making authority among the individual defendants is a factual question for discovery, not a pleading deficiency warranting dismissal. This is not a motion for summary judgment, despite Defendants' repeated effort to strategically and surreptitiously convert it to such.

In light of the foregoing, Defendants' motion to dismiss Counts One through Four must be denied.

## III. PLAINTIFFS ADEQUATELY PLEADED A CLAIM UNDER THE FIRST AMENDMENT.

**a. NJIT is a proper defendant under 42 U.S.C. § 1983.**

Defendants seek dismissal of Plaintiffs' 42 U.S.C. § 1983 claim against NJIT on the ground that NJIT is an arm of the state and therefore not a "person" subject to suit under 42 U.S.C. § 1983. While Plaintiffs do not dispute that Will v. Michigan Department of State Police, 491 U.S. 58 (1989), and its progeny establish the general principle that states and their instrumentalities are not "persons" under 42 U.S.C. § 1983. However, Defendants' argument fails in two critical respects:

First, the Fitchik arm-of-the-state analysis is a multi-factor balancing inquiry that cannot be resolved against Plaintiffs on the face of the pleadings without a developed factual record as to NJIT's actual fiscal and operational relationship with the State.

Second, and more fundamentally, even if NJIT were ultimately found to be an arm of the state, Will does not bar Plaintiffs' claims for prospective injunctive relief, which survive in full under the doctrine of Ex parte Young, 209 U.S. 123 (1908).

i. The Fitchik balancing test cannot be resolved against Plaintiffs at the pleading stage.

The Third Circuit has made clear that the arm-of-the-state determination under Fitchik v. N.J. Transit Rail Operations, Inc., 873 F.2d 655 (3d Cir. 1989), turns on the application of a three-part balancing test that weighs "(1) the funding factor: whether the state treasury is legally responsible for an adverse judgment entered against the alleged arm of the State; (2) the status under state law factor: whether the entity is treated as an arm of the State under state case law and statutes; and (3) the autonomy factor: whether, based largely on the structure of its internal governance, the entity retains significant autonomy from state control." Maliandi v. Montclair State Univ., 845 F.3d 77, 84 (3d Cir. 2016). No single factor is dispositive, and the Third Circuit has recognized that the autonomy factor in particular requires inquiry into the actual structure of the entity's governance and its practical independence from day-to-day state control. Id. at 84, 96.

Defendants seek to resolve this inherently factual and institution-specific inquiry by analogizing NJIT to Montclair State University and Ramapo College based solely on shared statutory characteristics common to all New Jersey public universities. But, the Fitchik framework does not permit such a categorical approach. The Third Circuit's analysis in Maliandi was driven by a detailed, record-based examination of Montclair's specific fiscal exposure to the state treasury, its actual governance structure, and the degree to which the State exercised practical control over its operations. 845 F.3d at 86-99. The superficial similarities Defendants invoke (i.e., eminent domain, gubernatorial board appointments, auditing requirements) are present in virtually every New Jersey public institution and do not, standing alone, resolve the balancing inquiry in Defendants' favor without a factual record as to NJIT specifically.

Most importantly, the autonomy factor, which examines whether the entity retains significant independence from state control, cannot be assessed on the pleadings alone. NJIT likely operates with a substantial degree of financial and operational independence: it generates significant revenues through tuition, grants, sponsored research, and private philanthropy; it enters into contracts, leases, and financial instruments in its own name; it sets its own academic, research, and operational priorities; and it competes in the market for faculty and students largely free of day-to-day State direction. These facts bear directly on the autonomy factor and cannot be resolved against Plaintiffs without discovery. Defendants' motion as to this claim is, at minimum, premature, and another example of its improper attempt to convert this to a summary judgment motion.

ii. Even if NJIT is an arm of the State, Will does not bar Plaintiffs' claims for prospective injunctive relief.

Defendants' arm-of-the-state argument, even if ultimately meritorious, does not warrant dismissal of Plaintiff's' 42 U.S.C. § 1983 claim in its entirety. The Supreme Court has long recognized that prospective injunctive relief against state officials sued in their official capacities is not barred by

Will or by sovereign immunity principles, under the doctrine first announced in Ex parte Young, 209 U.S. 123 (1908). See Will, 491 U.S. at 71 n.10 ("[A] state official in his or her official capacity, when sued for injunctive relief, would be a person under [42 U.S.C.] § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (quoting Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985)).

Here, Plaintiffs seek, among other relief, an injunction compelling NJIT to recognize SJP-NJIT as a student organization and to cease enforcing the name restriction. That prospective injunctive relief is properly sought against the individual defendant administrators in their official capacities under Ex parte Young and is not foreclosed by Will. To the extent Defendants' motion seeks to eliminate Plaintiffs' claims for prospective relief entirely, whether against NJIT directly or against its officers in their official capacities, it must be denied. At most, Will bars Plaintiffs' claims for damages against NJIT as an entity; it does not extinguish the injunctive relief Plaintiffs are entitled to pursue.

Accordingly, Defendants' motion to dismiss the 42 U.S.C. § 1983 claim in its entirety should be denied.

**b. Individual Defendants are not entitled to qualified immunity.**

In a 42 U.S.C. § 1983 action, when a defendant asserts qualified immunity, the court conducts a two-step analysis. First, the court must determine whether the plaintiff's allegations sufficiently establish the violation of a federal constitutional or statutory right. *See* Doe v. Delie, 257 F.3d 309, 315 (3d Cir. 2001). If that threshold is met, the court must then determine whether the right allegedly violated was clearly established at the time of the conduct; that is, whether a reasonable person would have known of its existence. Id. A defendant is entitled to qualified immunity, and dismissal of the action, if the plaintiff's allegations fail to satisfy either prong. Id.

Here, Individual Defendants are not entitled to qualified immunity because the right at issue, a student organization's First Amendment right to recognition at a public university without viewpoint-based discrimination, which was violated per the FAC, has been clearly established since Healy v. James, 408 U.S. 169, 181 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large . . . Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs.").

i. The right to recognition for student organizations without viewpoint discrimination is clearly established.

In Healy, the Supreme Court held that a public university's denial of recognition to a student organization because of the group's political affiliation and viewpoint violated the First Amendment. 408 U.S. at 187-88. The Court specifically held that a university cannot deny recognition based on a priori judgments about a national organization's "philosophy" of disruption. Id. This is precisely what NJIT did here. By denying recognition to SJP-NJIT because of the viewpoint associated with the name "Students for Justice in Palestine," that is, advocacy for Palestinian rights, while recognizing other organizations, NJIT engaged in classic viewpoint discrimination.

Finally, the Healy Court did not condition protection on the university's willingness to offer an alternative. The offer of a sanitized substitute does not cure a First Amendment violation; it confirms one. The name "Students for Justice in Palestine, New Jersey Institute of Technology Chapter" is not merely a label; it is itself expressive. It communicates the organization's ideological mission, its solidarity with Palestinian advocacy, and its place within a broader national movement of student activism.

Defendants' characterization of the naming restriction as "content neutral" and directed only at preventing confusion regarding affiliation is implausible on the pleaded facts. NJIT's stated reason,

that it does not want to associate with the ideologies of the national SJP organization, is, by definition, a viewpoint-based objection. The national SJP organization exists to advocate for Palestinian liberation. Disliking that organization is disliking that viewpoint. And, per Healy, a university may not condition recognition on a student group's willingness to distance itself from a particular viewpoint.

ii. The "misleading name" argument does not justify the restriction.

Defendants argue NJIT was permitted to restrict the name because it falsely implied affiliation with the national SJP organization. This argument fails for three reasons.

First, the name "Students for Justice in Palestine, New Jersey Institute of Technology Chapter" is not false. It describes exactly what the organization is: a group of NJIT students organized to pursue justice in Palestine. That the national SJP organization exists does not make these students' organization's name false. Thousands of student organizations across the country share names with national advocacy organizations. The mere existence of a national organization does not render a local group's similar name misleading.

Second, the cases Defendants cite involving discipline for false or misleading speech are inapposite. Hazelwood Sch. Dist. v. Kuhlmeier applies to school-sponsored speech; specifically, speech that bears the imprimatur of the school as part of a curricular or school-directed activity, such as a school newspaper drafted by students in the school's journalism class and paid to be printed by the school's Board of Education. *See* 484 U.S. 260, 262-263, 271 (1989). It has no application to the independent expressive activities of a student organization. *See* Rosenberger v. Rector & Visitors of the Univ. of Va, 515 U.S. 819, 833-34 (1995) (distinguishing Hazelwood and holding that a university's student activities program is not a school-sponsored forum to which Hazelwood deference applies). SJP-NJIT is not a school publication, a class project, or a school-directed activity; it is an independent student organization whose speech is not attributable to NJIT, which means Hazelwood does not govern.

The cases Defendants cite for the proposition that schools may regulate misleading student speech, Doninger v. Niehoff, 527 F.3d 41 (2d Cir. 2008); Kutchinski v. Freeland Community School District, 69 F.4th 350 (6th Cir. 2023); Ashton v. Okemos Public Schools, 716 F. Supp. 3d 517 (W.D. Mich. 2024), all involved affirmative student misconduct: a student posting false and vulgar content about a school band contest, a student creating a fake social media account impersonating a teacher then posting violent and sexual content, and a student making knowingly false statements about an interaction with the assistant principal. None of those cases remotely supports the proposition that a university may prohibit a student organization from using a chosen name on the ground that the name implies an affiliation the university finds objectionable, based upon the members' race, national origin, and ancestry. The leap from disciplining a student for impersonating a teacher to prohibiting an organization from adopting a name associated with a national advocacy movement is not a legal step, it is a constitutional overreach.

Likewise, the trademark-like authority Defendants invoke, Villanova Univ. v. Villanova Alumni Educ. Found., Inc., 123 F. Supp. 2d 293 (E.D. Pa. 2000) and Bd. of Regents of the Univ. of Houston Sys. v. Houston Coll. of Law, Inc., 214 F. Supp. 3d 573 (S.D. Tex. 2016), arose in the context of trademark infringement and unfair competition actions between competing institutions. Those cases stand for the unremarkable proposition that an organization may not mislead the public into believing it is affiliated with another institution for charitable and commercial purposes. Villanova, 123 F. Supp. 2d at 301-10; Bd. of Regents, 214 F. Supp. 3d at 582-603. They have no application to a public university's effort to suppress the name chosen by its own students. A public university is not a private brand owner entitled to prevent students from associating its name with causes it dislikes.

Third, and finally, even if the name created some risk of confusion, NJIT's remedy, total denial of recognition unless the students changed their name, is not narrowly tailored to address that interest.

NJIT could have required a disclaimer of affiliation, added clarifying language to the official recognition listing, or taken other steps short of denying recognition entirely.

iii. Individual Defendants' personal conduct violated Plaintiffs' clearly established constitutional rights.

Defendants argue the FAC fails to identify the specific constitutional violations committed by each individual defendant. The FAC identifies each individual defendant by name and title, alleges that each participated in the meetings and communications through which SJP-NJIT's applications were denied, and specifies the particular decisions and communications in which each was involved. *See* FAC "Parties ¶¶ 15-32; FAC "Facts" ¶¶ 48, 60, 64-66. At the pleading stage, this is sufficient.

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988), requires personal involvement; it does not require Plaintiffs to plead, in advance of discovery, the precise deliberative role each defendant played in what was necessarily a multi-participant institutional decision. The granular allocation of internal decisional responsibility among individual administrators is precisely the kind of factual question discovery is designed to resolve. Requiring Plaintiffs to plead it in their complaint before any discovery has occurred would improperly convert Rule 12(b)(6) into a summary judgment standard.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests that this Court deny Defendants' motion to dismiss in its entirety.

In the alternative, if any claim(s) is/are dismissed, Plaintiffs request leave to file a Second Amended Complaint to cure any pleading deficiency/ies identified by the Court.

Dated: May 18, 2026

**THE LAW OFFICE OF RAJEH A. SAADEH, L.L.C.**
/s/ Lindsay A. McKillop
**Lindsay A. McKillop - 276512018**
1200 Route 22 East, Suite 2000
Bridgewater, New Jersey 08807-2943
(908) 864-7884
**lmckillop**@rajehsaadeh.com