UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHAMBERS OF
MADELINE COX ARLEO
UNITED STATES DISTRICT JUDGE

MARTIN LUTHER KING COURTHOUSE
50 WALNUT ST. ROOM 4066
NEWARK, NJ 07101
973-297-4903

October 14, 2026

VIA ECF
All Counsel of Record

**LETTER ORDER**

**Re: Students for Justice in Palestine, et al., v. New Jersey Institute of Technology, et al.,**
**Civil Action No. 26-1771**

Dear Litigants:

Before the Court is New Jersey Institute of Technology, David Jones,[1] Matthew Golden,[2] Andrew Christ,[3] Latosha Wilson,[4] Bruce Bukiet,[5] Teik Lim,[6] Kathryn Hageman,[7] and Michael Davis'[8] ("Defendants") Motion to Dismiss, ECF No. 5 ("Motion") Plaintiff Students for Justice in Palestine, New Jersey Institute of Technology Chapter ("SJP-NJIT"), Yaha Habehh ("Habehh"), Umair Khan ("Khan"), Usman Ahmad Khwaja ("Khwaja"), Ibraheem Aljayeh ("Aljayeh"),

---

[1] At all times relevant to the Amended Complaint, David Jones was the Chief Diversity Officer at NJIT and will be referred to herein as "Jones" or "Defendant Jones." See Am. Compl., Facts ¶ 15.

[2] At all times relevant to the Amended Complaint, Matthew Golden was the chief marketing and communications officer at NJIT and will be referred to herein as "Golden" or "Defendant Golden." See id. ¶ 19.

[3] At all times relevant to the Amended Complaint, Andrew Christ was the Senior Vice President for Real Estate Development and Capital Operations at NJIT and will be referred to herein as "Christ" or "Defendant Christ." See id. ¶ 21.

[4] At all times relevant to the Amended Complaint, Latosha Wilson was the associate director of campus center operations and conference services at NJIT and will be referred to herein as "Wilson" or "Defendant Wilson." See id. ¶ 23.

[5] At all times relevant to the Amended Complaint, Bruce Bukiet was a math professor at NJIT and will be referred to herein as "Bukiet" or "Defendant Bukiet." See id. ¶ 25.

[6] At all times relevant to the Amended Complaint, Teik Lim was the President of NJIT and will be referred to herein as "Lim" or "Defendant Lim." See id. ¶ 27.

[7] At all times relevant to the Amended Complaint, Kathryn Hageman was the chief of staff to Defendant Lim and will be referred to herein as "Hageman" or "Defendant Hageman." See id. ¶ 29.

[8] At all times relevant to the Amended Complaint, Michael Davis was the director of student life at NJIT and will be referred to herein as "Davis" or "Defendant Davis." See id. ¶ 31.

Ahmad Jamhour ("Jamhour"), Faris Qaddoura's ("Qaddoura," together with Habehh, Khan, Khwaja, Aljayeh, Jamhour, and SJP-NJIT "Plaintiffs") Amended Complaint, ECF No. 1.1 at 82–108 ("Amended Complaint"). For the reasons set forth below, Defendants' Motion is **GRANTED**.

## I. Background

This matter arises out of Defendant New Jersey Institute of Technology's ("NJIT") alleged failure to formally recognize a student organization called Students for Justice in Palestine, New Jersey Institute of Technology Chapter. Plaintiffs initially filed this case in New Jersey state court on November 18, 2025. See ECF No. 1.1 at 14–37. Plaintiffs amended their initial complaint in state court on January 26, 2026 to add federal claims. See Am. Compl. Based on the newly added federal claims, Defendants removed the case to federal court. See ECF No. 1. Defendants subsequently moved to dismiss the Amended Complaint in its entirety.

Around September 25, 2023, Plaintiffs Habehh, Khan, Khwaja, Alijayeh, Jamhour, Qaddoura, students at NJIT ("Student Plaintiffs"), organized a group that they called SJP-NJIT. See Am. Compl., Facts ¶ 1.[9] A few weeks later, in the lead-up to a SJP-NJIT demonstration, a math professor at NJIT, Professor and now Defendant Bukiet, emailed members of NJIT's administration "likening supporters of Palestine to terrorists." See id. ¶ 2. On November 9, 2023, Defendant Bukiet aggressively questioned Christopher Won, the Associate Director for the Office of Inclusivity at NJIT ("Director Won"), about antisemitism on NJIT's campus and inquired about how NJIT was protecting Jewish students. See id. ¶ 3.

On December 18, 2023, NJIT refused to allow SJP-NJIT to participate in a student involvement fair. See id. ¶ 4. Around December 21, 2023, Jones emailed Director Won, demanding that he remove SJP-NJIT from his student organization roster because the group was not formally recognized by NJIT, see id. ¶ 5; Director Won responded that the roster was informal and offered as a resource for "identity-based student organizations," see id. ¶ 6. Director Won also stated that he believed NJIT was "being targeted" because other clubs listed on the roster were also not yet formally recognized. See id. ¶ 7. Jones then asked Director Won to limit the roster to student organizations that were officially recognized. See id. ¶ 8. Rather than update the roster, Director Won deleted it altogether. See id. ¶ 9.

On January 17, 2024, SJP-NJIT filed a formal application to be recognized as a student organization through NJIT's online portal, called "Highlander Hub." See id. ¶¶ 18–19. On February 13, 2024, Marybeth Boger, the Dean of Students at NJIT ("Boger" or "Defendant Boger"), and Jones met with Habehh and Jamhour and told them that SJP-NJIT's request for formal recognition was denied. See id. ¶¶ 22–23. In an email after the meeting, Habehh and Jamhour asked why the school declined to recognize SJP-NJIT, and Boger said "because [NJIT] does not like the national chapter of SJP." See id. ¶¶ 24–25.

Even though Jones and Boger had informed Habehh and Jamhour that the request for formal recognition was denied, as of August 26, 2024, SJP-NJIT's application for recognition

---

[9] The paragraph numbers in Plaintiffs' Amended Complaint restart in each new section. As such, the citations to paragraphs of the Amended Complaint herein will refer to the section in addition to the paragraph numbers.

remained pending in Highlander Hub. See id. ¶ 31–32. Habehh emailed Boger, Christ, and Golden to inform them that SJP-NJIT's request was still formally pending and demanding that they either approve the request to be recognized, deny the request and provide justification via email, or afford SJP-NJIT a probationary period to operate as a formally recognized organization. See id. ¶ 33. Boger emailed Habehh that NJIT would not officially recognize SJP-NJIT because of "the history of disruptions and policy violations supported by the national chapter of SJP at other universities." See id. ¶ 34 (cleaned up).

Plaintiffs also recount two random incidents that happened. On September 12, 2024, SJP-NJIT members tried to take tape from the NJIT campus center and were yelled at by Wilson, who said they "'are not entitled to anything' from NJIT." See id. ¶¶ 35–36. In January 2025, Wilson also "screamed" at members of SJP-NJIT for using a table that a different student organization had booked, not realizing that the organization that booked the table gave SJP-NJIT permission to use it. See id. ¶¶ 37–38.

In September 2025, SJP-NJIT elected a new president (the "SJP President") who sought formal recognition of SJP-NJIT via Highlander Hub on September 14, 2025. See id. ¶¶ 39–41. Shortly thereafter, Jones emailed the SJP President to meet about the newly submitted application. See id. ¶ 42. The SJP President and vice-president met with Jones, Davis, and Hanna Khadr, NJIT's Director of Student Organizations ("Khadr" or "Defendant Khadr"). See id. ¶ 43. The SJP President explained the importance of SJP-NJIT's name and stated that SJP-NJIT had no affiliation with the national chapter of SJP. See id. ¶¶ 45–46. Jones stated that NJIT would not recognize SJP-NJIT regardless of whether it was affiliated with the national chapter of SJP but stated that NJIT would recognize the organization under a different name. See id. ¶¶ 47–48.

The SJP President subsequently memorialized their understanding of the meeting in an email and asked for an explanation as to why SJP-NJIT was treated differently than other organizations at NJIT. See id. ¶¶ 49–50. On October 17, 2025, Boger and Khadr met with the SJP President and vice-president again. See id. ¶ 53. Boger explained that given the ceasefire between Israel and Palestine, NJIT was not as concerned about the national chapter. See id. ¶ 54. She also stated that although NJIT usually does not play a role in formally recognizing student organizations, she had directed the NJIT office of student involvement and leadership not to approve the SJP-NJIT application. See id. ¶¶ 55–56.

On October 21, 2025, Khadr, Hageman, and Christ met with the SJP President and vice-president. Hageman stated that NJIT's concern was that SJP-NJIT shares its name with the national chapter of SJP, that the national chapter of SJP has caused campus disruptions, that NJIT may lose federal funding if it approves SJP-NJIT, and that students attending NJIT may lose their visas if NJIT were to approve SJP-NJIT. See id. ¶ 60 (a)–(c). Christ suggested that SJP-NJIT change its name, see id. ¶ 60 (d), but the SJP President explained that the name was important to the organization, see id. ¶ 60(e). Christ "indicated the national chapter of SJP and Hamas will cause division on campus," see id. ¶ 60 (g), while the SJP President attempted to clarify that the national chapter of SJP is not associated with Hamas, see id. ¶ 60 (h).

On October 28, 2025, Davis denied SJP-NJIT's formal application via Highlander Hub, stating that the denial was based on "concerns from the university" as per previous conversations. See id. ¶ 62. On October 31, 2025, the SJP President emailed 17 members of the administration

seeking the basis for the denial and asking for the names of those involved in the decision to deny SJP-NJIT formal recognition. See id. ¶ 63. In response, on November 4, 2025, Hageman stated that "NJIT is ready and willing to approve your student group under an alternative approved name." See id. ¶ 64. On November 11, 2025, the SJP President emailed Boger and others asking whether NJIT was concerned with the group using the word "Palestine" in the name and reiterating his request for the basis for the denial and the names of individuals responsible for the denial. See id. ¶ 65.

On November 14, 2025, Davis denied SJP-NJIT's third application for formal recognition via Highlander Hub. See id. ¶ 66. On November 14, 2025, the SJP President followed up on his November 11 email but has received no response to date. See id. ¶¶ 67–68. SJP-NJIT is not formally recognized at NJIT. See id. ¶ 69.

## II. Legal Standard

In deciding a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint, draws all reasonable inferences in favor of the plaintiff, and determines whether the complaint has provided enough factual allegations to raise the plaintiff's "right to relief above the speculative level." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231–32 (3d Cir. 2008) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)). To survive, the claims must be facially plausible, meaning that the pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

## III. Discussion

### A. First Amendment Claims (Count Five)

Plaintiffs assert claims under the First Amendment, brought under 42 U.S.C. § 1983, against NJIT and against Defendants Boger, Golden, Christ, Lim, Hageman, and Davis ("Individual Defendants"), alleging that each acted in their individual capacity and in connection with his or her position at NJIT. See Am. Compl., Count V Wherefore Clause. Plaintiffs allege that "Defendants, individually and collectively, and under color of state law at all relevant times, deprived . . . Plaintiff[s], of their fundamentally constitutionally protected right to freedom of association through its refusal to recognize SJP-NJIT as a student organization." Id. ¶ 4. Plaintiffs allege that this "denial is an impermissible content-based restriction of association as applied to Plaintiff(s)." See id. ¶ 5.

Defendants seek to dismiss the First Amendment claims against NJIT on the basis that NJIT is not amenable to suit under Section 1983 because it is an arm of the state.[10] See Mot. at

[10] Whether NJIT is a "person" under Section 1983 depends on the factors articulated in Fitchik v. New Jersey Transit Rail Operations, Inc., 873 F.2d 655, 659 (3d Cir. 1989); see also Maliandi v. Montclair State U., 845 F.3d 77, 99 (3d Cir. 2016) (applying Fitchik factors in holding that Montclair State is an arm of the state and thus immune from suit). The three broad factors are as follows: "(1) whether the payment of the judgment would come from the state, (2) what status the entity has under state law, and (3) what degree of autonomy the entity has." See Febres v. Camden Bd. of Educ., 445 F.3d 227, 229 (3d Cir. 2006) (construing Fitchik factors).

20–23. Defendants seek to dismiss the claims against the Individual Defendants based on qualified immunity.[11] See id. at 23–30. The Court need not reach Defendants' substantive defenses because Count Five does not plausibly allege a violation of the First Amendment.

Plaintiffs' First Amendment claim appears to be based on the freedom of expressive association, which protects the ability of individuals to join together to advance shared views or engage in protected expression. See Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984) (recognizing the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.").

Plaintiffs have adequately pled that Defendants refused to recognize SJP-NJIT as an official student organization. See, e.g., Am. Compl., Facts ¶¶ 34, 61, 66. However, NJIT's nonrecognition of SJP-NJIT alone, as pleaded here, does not plausibly establish a burden on Plaintiffs' First Amendment rights. Cf. U. at Buffalo Young Americans for Freedom v. U. at Buffalo Student Assn. Inc., No. 25-140, 2025 WL 3075633, at *2 (2d Cir. Nov. 3, 2025) (ruling, on standing grounds, that derecognizing student organization "with nothing more, does not constitute an injury in fact").

Rather, Plaintiffs also must allege a practical consequence of that nonrecognition that impeded free association. See Healy v. James, 408 U.S. 169, 181–182 (1972) ("The practical effect of nonrecognition was demonstrated in this case when . . . petitioners were not allowed to hold a meeting in the campus coffee shop because they were not an approved group" and when they were denied "access to the customary media for communicating with the administration, faculty members, and other students."); see also Aman v. Handler, 653 F.2d 41, 44 (1st Cir. 1981) (holding that "nonrecognition is not simply denial of the 'college's stamp of approval,'. . . but seems also likely to mean 'denial of use of campus facilities for meetings and other appropriate purposes.'") (citing Healy, 408 U.S. at 181–182). Here, unlike in Healy, Plaintiffs do not contend that they were prohibited from, for example, meeting on campus, communicating through a school newsletter, recruiting new members, or other engaging in any other associational activities as a result of nonrecognition.

Plaintiffs' Amended Complaint includes allegations that could form the basis for a distinct First Amendment claim, if properly pleaded. For example, Plaintiffs allege that "around December 18, 2023, NJIT refused to allow SJP-NJIT to participate in a student involvement fair." See id., Facts ¶ 4. But Plaintiffs do not allege that this exclusion was based on lack of formal recognition, nor can the Court reasonably make that inference, since the activities fair exclusion preceded SJP-NJIT's first formal application for recognition. See id. ¶ 18. Plaintiffs also do not

---

The analysis is not as straightforward as Defendants suggest. Rather than meaningfully applying the relevant factors bearing on whether NJIT is a "person" under Section 1983, Defendants rely on the analysis in Maliandi and analogize NJIT to Montclair State University. See Mot. at 20–23. Multiple subfactors, including NJIT's financial independence from the State, the fact that NJIT can sue and be sued in its own name, and its independent incorporation, appear to differentiate it from Montclair State University. See New Jersey Institute of Technology Consolidated Financial Statements for FY 2022 at 12, available at https://www.njit.edu/finance/financial-statements (indicating that for the year 2022, less than half of NJIT's total reported revenue was provided by New Jersey); see N.J.S.A. 18A:64E-18(u) (allowing NJIT to sue and be sued in its own name); see N.J.S.A. 18A:64E-14 (separately incorporating NJIT).

[11] Any renewed motion may raise qualified immunity as a basis for dismissal but must specifically identify the constitutional right allegedly violated and must address whether that right was clearly established.

identify the exclusion from the student activities fair as the challenged action or allege that this exclusion was based on SJP-NJIT's viewpoint. Accordingly, that allegation does not supply the missing factual connection between nonrecognition and the burden on protected association.

Consequently, Plaintiffs' First Amendment claim is dismissed without prejudice. Any amended pleading must identify the precise constitutional theory asserted, the practical effect of nonrecognition on Plaintiffs' ability to engage in associational activities, and each Defendant's alleged role in the challenged conduct.

**B. Plaintiffs' Title VI Claim (Count Six)**

Plaintiffs allege that "NJIT's denial of [and] refusal to recognize SJP-NJIT as a student organization excluded Plaintiffs from participation in, denied them the benefits of, and subjected them to discrimination on the bases of race, national origin, and ancestry." See Am. Compl., Count VI ¶ 3. Plaintiffs assert Count VI against NJIT and Defendants Boger, Golden, Christ, Lim, Hageman, and Davis. See id. Count VI, Wherefore Clause.

***Against NJIT.*** Title VI provides that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Therefore, to state a private Title VI claim, a plaintiff must plausibly allege that: (1) the defendant operates a program or activity receiving federal financial assistance, and (2) defendant intentionally discriminated against the plaintiff on the ground of race, color, or national origin. See Alexander v. Sandoval, 532 U.S. 275, 280–81 (2001) (limiting private rights of action under Title VI to those based on intentional discrimination).

Plaintiffs sufficiently allege that NJIT receives federal funds. See Am. Compl., Count VI ¶ 2. However, Plaintiffs fail to allege that NJIT "refus[ed] to recognize SJP-NJIT as a student organization" on the basis of any Plaintiff's race, color, or national origin.[12] Id., Count VI ¶ 3. Plaintiffs do not plead their race, color, or national origin. Nor do they allege that NJIT perceived any Plaintiff to possess any particular protected characteristic. See generally Am. Compl. The fact that the Student Plaintiffs associated with a student group with the word "Palestine" in its title does not establish that those students are in a protected race-, color-, or national origin-based group; it simply indicates that they seek to advocate on behalf of a group that supports Palestine.

Plaintiffs' claims also do not plausibly allege facts supporting an inference that NJIT refused to recognize SJP-NJIT because of such a characteristic. Instead, Count VI offers only the conclusory phrase that NJIT "subjected them to discrimination on the bases of race, national origin, and ancestry." Id., Count VI ¶ 3. Such conclusory phrases cannot satisfy Plaintiffs' pleading burden. Twombly, 550 U.S. at 555

As such, Plaintiffs' Title VI claim against NJIT is dismissed without prejudice. In any amended pleading asserting a Title VI claim, Plaintiffs must allege facts identifying the race, color, or national origin on which the alleged intentional discrimination was based. Plaintiffs also must

[12] In fact, Plaintiffs allege that Defendants offered to "recognize the organization under a different name." Am. Compl., Facts ¶ 48.

allege facts plausibly supporting an inference that NJIT refused to recognize SJP-NJIT because of Plaintiffs' protected characteristics, rather than based solely on SJP-NJIT's political viewpoint, political advocacy, or affiliation with a political organization.

***Against Individual Defendants.*** A Title VI claim cannot be brought against an individual because an "individual is not a 'program' receiving federal funds." Bethea v. Roizman, No. 11-254, 2012 WL 2500592, at *15 (D.N.J. June 27, 2012) (citing Whitfield v. Notre Dame Middle Sch., 412 Fed. App'x. 517, 521 (3d Cir. 2011)). This claim is dismissed with prejudice as to Defendants Boger, Golden, Christ, Lim, Hageman, and Davis.

### C. Plaintiffs' NJLAD and NJCRA Claims against Bukiet (Count Four)

Plaintiffs' Count Four asserts claims based on the New Jersey Law Against Discrimination ("NJLAD") and the New Jersey Civil Rights Act ("NJCRA") based on "[Professor] Bukiet's course of conduct." See Am. Compl., Count IV ¶ 2. Both the NJLAD and NJCRA have two-year statutes of limitations. See Hall v. St. Joseph's Hosp., 343 N.J. Super. 88, 100 (App. Div. 2001) (two-year statute of limitations applies to NJLAD claims); see Lapolla v.Cnty of Union, 449 N.J. Super. 288, 298 (App. Div. 2017) (two-year statute of limitations applies to claims brought under the NJCRA).

Defendant Bukiet's actions forming the basis of Count Four all took place more than two years before Plaintiffs filed the initial complaint. Specifically, Plaintiffs allege that "[o]n or around October 12, 2023, Bukiet emailed various members of NJIT's administration respecting an upcoming demonstration scheduled by SJP-NJIT, likening supporters of Palestine to terrorists." See Am. Compl., Facts ¶ 2. Plaintiffs also allege that "[o]n or around November 9, 2023, Defendant Bukiet harassed Won during a presentation with aggressive questions and non sequiturs about purported antisemitism on NJIT's campus and what NJIT was doing to protect Jewish students." Id. ¶ 3. Although Count Four characterizes the allegations as a "course of conduct," it identifies no conduct by Defendant Bukiet after November 9, 2023. Id. ¶ 3. The initial complaint was filed more than two years later, on November 18, 2025. See ECF No. 1.1 at 14–37.

Count Four identifies only Defendant Bukiet's two acts as the basis for this claim. To the extent that Plaintiffs seek to hold NJIT liable for those acts, the claim accrues from the same conduct and is untimely for the same reason. The Amended Complaint identifies no separate, timely action by NJIT as forming the basis for Count Four.

As presently pleaded, Count Four is untimely. But the Court dismisses the claim without prejudice because Plaintiffs may be able to allege facts supporting delayed accrual. See Adams v. Hult, No.14-6820, 2016 WL 5745111, at *4 (D.N.J. Sept. 30, 2016) (NJCRA claim accrues on date of incident or when injured party knows or should have known of the basis for an actionable claim) (citation omitted); Ragsdale v. Lora, No. 22-16123, 2021 WL 4099785, at *4 (D.N.J. Sept. 9, 2021) (NJCRA claim accrues "when plaintiffs knew or should have known about those alleged violations of their rights") (citations omitted). Any amended pleading asserting a claim based on Defendant Bukiet's conduct must identify, for each plaintiff, when and how that plaintiff learned of the alleged conduct and why it was not reasonably discoverable earlier.

**D. Plaintiffs' Remaining NJLAD Claims (Counts One, Two, and Three)**

Plaintiffs' Counts One, Two, and Three allege violations of the NJLAD and the NJCRA against NJIT and the Individual Defendants. As far as these claims are based on the NJLAD, they all fail for the same reason: the Amended Complaint does not plausibly allege that Defendants acted because of a protected characteristic enumerated by the NJLAD.

The NJLAD recognizes the opportunity to obtain "all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of race, creed, color, national origin, ancestry, [or] nationality" as a civil right. N.J.S.A. § 10:5-4. A place of public accommodation includes any college and university. See N.J.S.A. § 10:5-5(l). Under the NJLAD, the withholding, denial, or discrimination in furnishing the accommodations, advantages, facilities, or privileges of a place of public accommodation because of an enumerated protected characteristic is unlawful. N.J.S.A. § 10:5-12(f)(1).

To state a claim under the NJLAD, Plaintiffs must allege more than adverse treatment. They must plausibly allege that the discriminatory conduct would not have occurred because of the protected characteristic. See L.W. ex rel. L.G. v. Toms River Regl. Schools Bd. of Educ., 915 A.2d 535, 547 (N.J. 2007).

Although Counts One through Three characterize Defendants' conduct as discrimination based on race, creed, national origin, and ancestry, the Amended Complaint pleads no facts connecting the challenged conduct to any of those protected characteristics. Plaintiffs allege that NJIT officials expressed concern about SJP-NJIT's name, its perceived relationship with the national chapter of SJP, the national chapter of SJP's disruptions and divisions on other campuses, and related matters. See, e.g., Am. Compl., Facts ¶ 25, 34, 47–48, 60. But Plaintiffs also allege that Defendants offered to "recognize the organization under a different name." Id. ¶ 48 Those factual allegations do not connect Defendants' conduct to any Plaintiff's protected characteristic. As such, Plaintiffs do not plausibly allege discrimination because of race, creed, color, national origin, ancestry, or nationality.

It is for that same reason that Plaintiffs' NJCRA Claims must be dismissed. The NJCRA is not a stand-alone cause of action for discrimination. See Trafton v. City of Woodbury, 799 F. Supp. 2d 417, 443 (D.N.J. 2011) ("The [NJCRA] was modeled after 42 U.S.C. § 1983 and creates a private cause of action for violations of civil rights secured under the New Jersey Constitutions"). Accordingly, it provides a remedy for the deprivation of substantive due-process or equal protection rights secured by the federal constitution or laws, and for the deprivation of substantive rights, privileges, or immunities secured by the New Jersey Constitution or laws. See N.J.S.A. § 10:6-2. Plaintiffs' Counts One through Three do not identify a state or federal right or law that Defendants allegedly infringed. To the extent that Plaintiffs seek to allege an equal protection violation based on a protected characteristic, Plaintiffs have not alleged that they have a protected characteristic, nor have they alleged that Defendants treated Plaintiffs differently based on such protected characteristic. And as stated above, they have not sufficiently alleged a First Amendment violation.

As such, Plaintiffs' Counts One through Three are dismissed without prejudice. Any amended pleading alleging an NJLAD violation must set forth facts that would "allow[] the court

to draw the reasonable inference that the defendant is liable for" discrimination that would not have occurred but for a characteristic protected by the NJLAD. Iqbal, 556 U.S. at 678. Any amended pleading alleging a NJCRA violation must identify a substantive right secured by the United States or New Jersey Constitutions or laws and plausibly plead facts establishing Defendants' violation of that right.

***

Plaintiffs seek injunctive relief for the alleged violations pleaded in the Amended Complaint. See Am. Compl. Counts I–VI, Wherefore Clauses. Plaintiffs pleaded that they were students at NJIT at all times relevant to the Amended Complaint. See, e.g., Am. Compl., Parties ¶¶ 3, 5, 7, 9, 11, 13. But if Plaintiffs are not current students at NJIT and do not plan to re-enroll as students at NJIT, they do not have standing to pursue injunctive relief. See Bostrom v. New Jersey Div. of Youth & Family Servs., 969 F.Supp.2d 393, 417 (D.N.J.2013) ("In order to establish a claim for injunctive relief in a federal forum, a plaintiff must show that he or she is likely to suffer future injury from the defendant's illegal conduct.").

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss, ECF No. 5, is **GRANTED**.

Plaintiffs' Count Six against the Individual Defendants is **DISMISSED WITH PREJUDICE**. Counts One through Five and Count Six against NJIT are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs have twenty days from the entry of this order to file a Second Amended Complaint.

Should any amended pleading include a claim for injunctive relief, it should also allege the basis for Plaintiffs' standing to seek such relief.

Any amended complaint shall number its paragraphs consecutively throughout the pleading and shall identify, for each claim, the factual allegations supporting that claim and each Defendant's alleged role.

**SO ORDERED**.

Dated: October 14, 2026

*s/ Madeline Cox Arleo*
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**